UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| SHALANDRA JONES, | |
| Plaintiff, | Case No. 14-cv-10384 |
| | Honorable Laurie J. Michelson |
| v. | Magistrate Judge R. Steven Whalen |
| DAVID LACEY, in his official and individual capacities, and CITY OF DEARBORN, a Michigan municipality, | |
| Defendants. | |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [26]

This lawsuit arose from a traffic stop in Dearborn, Michigan. Defendant Dearborn Police Officer David Lacey stopped a car for a broken taillight. The encounter was recorded by the Officer's dash cam video. Plaintiff Shalandra Jones was a passenger in the car and her now-husband Mark Scott was driving. On approach, Lacey smelled marijuana. Jones took responsibility for the marijuana and presented an expired Michigan medical marijuana license. For a few minutes, it seemed that Lacey would allow the two to leave without any penalty. But as Lacey searched Jones' purse, she revealed that she was HIV-positive. This upset Lacey and he made several statements admonishing Jones for not telling him earlier. He issued a citation to Jones for the marijuana and Scott for the taillight while stating, "Honestly, if it wasn't for [Jones' failure to inform him of her HIV status], I don't think I would have wrote anybody for anything . . . ." A reporter, with Jones' permission, obtained the dashcam video of the incident, and the video, which includes Lacey's statement, was eventually posted on YouTube.

Based on this incident and the Dearborn Police Department's alleged failure to train its officers in interacting with individuals with HIV/AIDS, Jones filed this lawsuit under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, and Michigan privacy law. She alleges that Lacey violated her constitutional rights under the Fourth and Fourteenth Amendments, her rights under the ADA, and her Michigan statutory right to privacy in her HIV status. Against the City of Dearborn, she asserts a *Monell* failure-to-train claim. Defendants filed a motion for summary judgment on all claims on January 16, 2015. The Motion is fully briefed, the Court heard oral argument on May 7, and the matter is now ready for disposition.

For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment (Dkt. 26.)

## I.  FACTUAL BACKGROUND

Because this is Defendants' motion, the Court views the facts and inferences in the light most favorable to Jones. There is a dascam video of the incident in question, but only the video transcript is part of the record. Neither side disputes the accuracy of the transcript.

### A.  Jones' Background

Jones was diagnosed with HIV in 2001. (Dkt. 26-10, Jones Dep. at 28.) She testified that people in her neighborhood discovered her status through a friend of her mother's and started treating her differently. (*Id*. at 33–34.) Her children were being teased in school. (*Id*. at 35.) She found out that some people were making untrue statements about her lifestyle and the manner in which she contracted HIV. (*Id*. at 34.) Upset, Jones "made a flyer with [her] picture on it . . . . [and] a small bio" and "plastered it on every gas station, liquor store, and [she] invit[ed] people to come out to hear how [she] contracted the virus." (*Id*. at 34.) Ultimately, "200 people came out to hear [Jones'] story." (*Id*. at 35.) Jones commented in her deposition that "[i]t's hard

listening to what people say. Everybody's not a drug addict. Everybody's not a prostitute. People don't contract HIV always by having sex. So I took a stand for myself. And so that – that is how the community found out where I live. That I was HIV positive." (*Id.* at 35–36.)

After her community talk, Jones was offered a position at Voices of Detroit Initiative, where she continues to work. (*Id*. at 35.) Voices of Detroit is a nonprofit healthcare-related organization supported by the Southeastern Michigan Health Association. (*Id*. at 16.) Jones' HIV status is now "undetectable," meaning that the virus is "sort of like in remission." (*Id*. at 36.) Jones continues to see a physician every six months. (*Id*. at 36.) Her treatment regime consists of Atripla once a day and a medical marijuana prescription. (*Id*. at 28, 32.)

## B. The Traffic Stop

The incident at issue in this case occurred on August 3, 2012. (Dkt. 26-13, Police Report.) Jones and her boyfriend (now husband) Mark Scott were driving in Dearborn in a 1999 GMC Jimmy. (*Id.*) Lacey was patrolling the area and noticed that the vehicle's left brake light was out and so he decided to stop the car. (Dkt. 26-12, Video Tr. at 7.)

On approaching the vehicle, Lacey noticed a "strong" smell of marijuana. (Video Tr. at 8.) Lacey questioned Scott and Jones about the marijuana, and Scott replied that there "might be something in here" but that the two had not been smoking. (*Id.* at 3.) Scott admitted that he did not have a driver's license on him and that there was "possibly" a warrant for his arrest for an outstanding traffic ticket. (*Id.* at 2.) Lacey stated: "To tell you the truth, I'm not worried about a little bag of weed or something like that. . . . A dime bag I'm not really worried about." (*Id.* at 3.) Jones responded that there was a bag of marijuana in the car but no other contraband (Jones confirmed that there was marijuana in the car at her deposition (Jones

3

Dep. at 36)). (Video Tr. at 3.) Jones retrieved the bag of marijuana from the car door and Lacey continued to question the two regarding the contents of the vehicle. (*Id.* at 5.)

Lacey asked Scott, who was behind the wheel, to step out of the car. (Video Tr. at 6.) Lacey asked Jones if she had a driver's license, she responded that she did. (*Id.* at 5.) As Lacey continued to question the two, he commented "I'll try to make this quick. . . . just as long as everything else is straight and there's nothing else in the car. . . . she can drive and you can go on your merry way." (*Id.* at 5–6.)

Lacey then asked Scott to sit in his police car while Lacey returned to the Jimmy to "check everything out." (*Id.* at 6.) In the car, Lacey asked Scott about his warrants and criminal history. (*Id.* at 8–9.) Lacey made several comments to Scott regarding the marijuana while Scott was sitting in the car: "[T]hat's some strong shit right there" and "Wherever you got that from is a good spot." (*Id.* at 8.) Before returning to the Jimmy, Lacey said to Scott "As soon as – as long as everything's straight, we'll get you out of here in just a second." (*Id.* at 11.)

Upon his return to the vehicle, Lacey said to Jones: "Ma'am, why don't you step on out here for a second. Make sure everything is straight in here, like I said. When everything is good, we'll have you drive and get everybody out of here. Okay?" (Video Tr. at 11–12.) Lacey asked Jones if she had "anything that's going to poke me or stab me on [her] person" but it is unclear whether Jones responded. (*Id.* at 12.) At this point, Jones admitted that the marijuana was hers. (*Id.* at 12.)

As Lacey was searching Jones' effects (it appears from a later portion of the transcript that he was looking in her purse), he came across some medications and asked Jones what they were. (Video Tr. at 12, 14.) Jones responded: "I'm HIV positive." (*Id.* at 12.) Lacey replied: "Okay. That's probably something to tell me when you get out of the car. Okay? If you ever get

pulled out for any reason, you want to tell us. Okay? . . . Because I want to make sure I put gloves on and all that stuff." (*Id.* at 12.)

Apparently speaking to both Jones and Scott at once (it is unclear from the transcript whether Scott was still in the police car at this point), Lacey asked, "Whose weed is that?" (Video Tr. at 13.) Scott responded that there was a "marijuana card" and Jones said that it was hers. (*Id.* at 13.) But Jones said that the medical marijuana card was expired. (*Id.* at 13.) She confirmed this at her deposition. (Jones Dep. at 37.)

Apparently turning to Jones, Lacey stated "Okay. I'm now a little edgy about the HIV thing. Here I am digging through your purse. Are your – are your piercings and stuff like that in there?" (Video Tr. at 14.) Jones responded, "Nothing is in there that you can get HIV from." (*Id.* at 14.)

Lacey also asked Scott "Does she [Jones] have anything I should know about?" (*Id.* at 14.) Scott responded, "Yeah. She's been – she's been diagnosed HIV positive." (*Id.* at 15.) Scott and Lacey then engaged in the following exchange:

> OFFICER LACEY: That might be something you want to tell a cop if they ever pull you out of a car. I'm here going through her purse, and she's got earrings and shit I'm touching, and I don't want to catch anything.
>
> MR. SCOTT: It's not like that, sir.
>
> OFFICER LACEY: Well –
>
> MR. SCOTT: It's not like that.
>
> OFFICER LACEY: I know this is the west end of Dearborn, but I work a lot of the east end of Dearborn. So, I deal with plenty of crackheads and heroin addicts. Usually –
>
> MR. SCOTT: Well, that's –
>
> OFFICER LACEY: – they all tell you if they got a needle on them. If you ask them, 'You got anything on you I should know about?' 'Yeah, I got a needle and

5

I'm hep C. I'm this. I'm that' And they'll tell you right away what they got, so that way we don't get pissed. Because, otherwise, we get pissed, bad things happen.

MR. SCOTT: Yes, sir. I –

OFFICER LACEY: I found a needle on a guy once, and he didn't tell me, [well] let's just say he doesn't do that anymore. He didn't – he's not going to forget anymore."

. . .

OFFICER LACEY: I don't want to catch nothing, you know. I don't want that shit.

(*Id.* at 15–16.)

Lacey then stated that Jones would "need[] to get [her medical marijuana card] up-to-date. . . . And even though I'm still pissed about the HIV thing, I'm still cutting you guys a break. I'm not taking anybody to jail." (*Id.* at 17.) Instead, Lacey said he would write Scott a "fix-it ticket . . . . Go get [Scott's outstanding ticket] taken care of, get your license straightened out. . . . ditto on the defective equipment, the reason I stopped the car in the first place." (*Id.* at 19–20.) And regarding Jones, "I gave her a deal, too, and I'll explain it to her. Since she's got a valid license, she's going to drive the car instead of me towing it." (*Id.* at 22.)

Lacey then addressed Jones: "Stuff like [your HIV status], as soon as I'm getting you out of the car, 'Sir, I'd like to tell you I'm HIV positive.' Whatever it is, tell me right away. . . . I understand that what you have isn't something that (inaudible), but it makes me nervous. I don't want to take home nothing like that, you know what I mean." (*Id.* at 22–23.) And then, "Honestly, if it wasn't for that, I don't think I would have wrote anybody for anything, but that kind of really aggravated me, you know what I mean. . . . You notice I walked back and got my gloves out and put them on, because I don't, you know, [want] to come into contact with anything at all." (*Id.* at 23.) He told Jones that he had written her up for the marijuana, but that

6

she should "get [her] marijuana card, and we'll talk, we'll figure out what's going on." (Video Tr. at 23.) Lacey ended the encounter with a final comment: "[I]f you know we're going to look through the car, say something. Okay?" (*Id.* at 24.)

Jones testified that the incident reminded her of how she was treated when she was first diagnosed with HIV: "It ruined me. It crushed me. It made me start all over. The things that was said was unnecessary. . . . I work in [the] HIV field. I see how this affects people. . . . my kids should not lose friends because now their friends know that their mom is HIV positive." (Jones Dep. at 55–56.) Jones attended counseling after the incident but stopped attending after an insurance issue arose. (*Id.* at 58–59.)

### C. Aftermath

After the traffic stop, Jones discussed the stop with her family and her friend Nicole. (Jones Dep. at 40.) Nicole then contacted a reporter, Todd Heywood. (*Id.* at 41.) Heywood called Jones and asked her permission "to get the tape," which Jones gave. (*Id.* at 42.) Heywood then submitted a request to the Dearborn Police Department under Michigan's Freedom of Information Act ("FOIA"). (Dkt. 26-14, FOIA Request.) He requested, among other items, "Any and all written reports, tickets, and complaints arising from the Friday August 3, 2012 traffic stop of Shalandra Jones and an unidentified male companion. . . . [and] Dashboard video or other similar electronic recordings from the above mentioned traffic stop." (*Id.* at 1.) An unredacted version of the tape was provided to Heywood.

Eventually, Heywood released the video to the public. (Jones Dep. at 42.) Other documents in the record reveal that the video was posted on YouTube. (*See* Dkt. 26-15, Notice of Written Reprimand, at 1.) When asked whether she knew Heywood would publish the video, Jones responded "Yeah, he's a reporter. I knew that he would – I thought it would be a story."

(Jones Dep. at 43.) But she also said that she was surprised at the publicity. (*Id.* at 43.) About a year later, Heywood interviewed Jones about the incident. (*Id.* at 43.) Heywood published the interview on POZ, "a site for HIV people." (*Id.* at 44.)

### D. Discipline

After the video was posted on YouTube, the Dearborn Police Department issued Lacey a written reprimand:

> Ofc. Lacey violated Dearborn Police Department Rules and Regulations Section 1 – Unbecoming Conduct and Section 24 – Courtesy, by the use of insolent and insensitive language expressing prejudice towards a female who was revealed to be HIV positive. Ofc. Lacey's comments as captured by in-car video and audio, and later posted on YouTube, were unnecessary and inappropriate. The result of these statements, not only negatively reflect on Ofc. Lacey, but consequentially also brought the police department into disrepute.

(Notice of Written Reprimand at 1.) In addition to the written reprimand, Lacey received 10 days unpaid suspension "to be held in abeyance pending any further incidents of similar conduct or any other major conduct violations." (*Id.*) He was ordered to attend two classes: an interpersonal communication class and a "Blood Bourne Pathogens" class. (*Id.*)

### E. Officer Training

The parties have provided certain materials and deposition excerpts regarding the Dearborn Police Department's efforts to train officers on disabilities, and HIV/AIDS in particular.

The only written policy in the record that appears to mention HIV/AIDS is the Department's General Order on Bloodborne Pathogens and Communicable Disease Exposure Control Plan. (Dkt. 27-5, Control Plan.) The Order provides information regarding certain communicable diseases and how officers can minimize exposure when interacting with the public. In particular, it provides that "Exposure occurs when a person's blood or body fluids

8

mixed with blood, transfers to another person's blood stream. This can occur in three ways[:] a. Needle sticks (e.g. accidental needle stick while searching people or places)[;] b. Human bites[;] c. Through openings in the skin (e.g. cuts, sores, abrasions, etc.) which are exposed to blood or body fluids." (*Id.* at PageID 563.) And further, "The mere handling of a victim does not constitute an exposure. For an actual exposure to occur at least one of the above conditions must be met." (*Id.*)

Lacey also testified regarding the training he received during his tenure at the Dearborn Police Department. He first had to complete the Certificate in Law Enforcement. (Dkt. 26-3, Lacey Dep. at 12.) When asked whether this training included any instruction regarding people with disabilities, he stated that he learned about "[m]aking accommodations for people who may be disabled in some [] way that wouldn't have the same abilities as a person who didn't have a disability . . . . how to interview people, how to talk to people . . . . Blood borne pathogens . . . using universal precautions." (*Id.*) He also stated that "We receive annual training every single year[] that would include generally a blood borne pathogen training, cultural diversity training. It generally includes several other updates yearly. It's a several day long in-service training or sometimes bimonthly roll call trainings on various topics that may be either new or updated in law enforcement." (*Id.* at 13.)

When asked what kind of training he received regarding HIV, Lacey responded that "Anything blood borne pathogen related would be under that category. Generally the training is focused to keep yourself and any others protected against any infectious diseases or blood born[e] pathogens while encountering somebody that may have such a disability w[ear] precautionary measures such as gloves and stuff of that matter to protect yourself." (*Id.* at 13.)

When asked whether there was any cultural diversity training, Lacey responded that "Generally, once you complete the police academy you go through a two-week in-house training with the Dearborn Police Department, part of that has to do with some training regarding speaking to people that's called verbal judo, you receive that training, several day course I believe. From there on out your annual in-service training that I mentioned before. Generally a cultural diversity class is included in there regarding people of different nationalities, dealing with people that may be different from what you're used to, cultural differences that you may encounter." (*Id.* at 14.)

Plaintiff's counsel asked several members of the Dearborn Police Department, including Lacey, whether the Department had any activities or programming specific to HIV/AIDS and how to interact with individuals with HIV/AIDS. Lacey responded "Not specifically." (*Id.* at 15.) Chief of Police Ronald Haddad responded "Not directly." (Dkt. 26-6, Haddad Dep. at 17.) Commander Jimmy Solomon responded "Police Department training would be the same, bloodborne pathogen classes. There's also through promotional tests, you have to study our policies and procedures as part of the promotional process. . . . it covers several different types of exposures that people can have. It covers medical process procedures on what to do if somebody is exposed." (Dkt. 27-7, Solomon Dep. at 13–14.) Lieutenant Donald Armstrong responded "No." (Dkt. 27-8, Armstrong Dep. at 7.)

### F. Procedural History

Jones filed this case on January 27, 2014. (Compl.) She asserts four claims: violation of her constitutional right to privacy by Lacey under 42 U.S.C. § 1983 (Count I); a municipal liability claim against the City of Dearborn under 42 U.S.C. § 1983 (Count II); a claim against both Lacey and the City of Dearborn under Title II of the Americans with Disabilities Act

10

("ADA") (Count III); and violation of Michigan's HIV/AIDS Privacy Law, Michigan Compiled Law § 333.5131, by the City (Count IV).

Defendants filed a motion for summary judgment on all claims on January 16, 2014. (Dkt. 26.) The motion is fully briefed and the Court heard oral argument on May 4, 2015.

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

Because Defendants do not bear the burden of persuasion at trial, they may discharge their initial summary-judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support [Plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If Defendants do so, Jones "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of Plaintiff's claims to a jury, or whether the evidence is so one-sided that Defendants must prevail as a matter of law. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

The Court will address each of Jones' claims in turn. The Court finds that Lacey did not violate Jones' informational privacy rights where her HIV status was already in the public domain. The Court also finds that Jones' *Monell* claim fails because she cannot establish that the City was deliberately indifferent. Jones' statutory privacy claim fails because the City is not a proper defendant under the statute. However, Lacey's statements to Jones regarding his motivation and frame of mind in issuing the ticket are sufficient to create a genuine dispute of material fact as to whether Lacey issued citations because of Jones' HIV positive status. Thus, the Court will dismiss all but Count III, the ADA violation against Lacey.

### A. Count I – Section 1983 Claim Against Lacey

In her Complaint, Plaintiff alleges that Lacey's actions during the traffic stop violated her "fundamental right to privacy as to the disclosure of a private individual's HIV positive status" and her "right to be free from unreasonable searches and/or seizures." (Compl. at ¶ 31.) In her Response to the summary judgment motion, however, Jones acknowledges that she "does not seek relief under the 4th Amendment for unreasonable search and seizure, so issues of probable cause do not apply." (Dkt. 27, Resp. at 8.) Nor did she provide any briefing on the Fourth Amendment issue. Thus, the Court will grant summary judgment on this issue.

With respect to Plaintiff's claim that Lacey's actions during the traffic stop violated her "fundamental right to privacy as to the disclosure of a private individual's HIV positive status" Lacey argues that he is entitled to qualified immunity. (Def.'s Br. at 13.) Qualified immunity shields a government officer from suit when the officer "reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 245 (2009). The doctrine "balances two important interests—the need to hold public officials accountable when they

12

exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231.

In order to defeat a qualified-immunity defense, a plaintiff must establish (1) that the defendant violated a constitutional right; and (2) that the right was "clearly established" at the time. *Leary v. Livingston Cty.*, 528 F.3d 438, 441 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). District courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 232. "In assessing . . . immunity at the summary judgment phase of the case, [courts] give the plaintiff the benefit of all reasonable factual inferences from the record, asking only whether the officers are entitled to judgment as a matter of law." *Krause v. Jones*, 765 F.3d 675, 679 (6th Cir. 2014).

Jones' informational privacy claim arises from the following chain of events: Jones told her friend Nicole about her encounter with Officer Lacey. Nicole then told Heywood, a reporter, who (presumably) decided to do a story on the incident. Heywood called Jones and asked her permission to get the dashcam video from Lacey's vehicle. Jones agreed, Heywood submitted the request, and the City released the tape. Jones now asserts that because the City granted Heywood's FOIA request to release the dashcam footage without redacting her admission of her HIV status, the City violated her informational privacy rights. Lacey defends on the basis of only one qualified-immunity prong: he says that there was no constitutional violation. The Court agrees.

The Supreme Court has recognized two types of privacy interests under the Fourteenth Amendment. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen*

*v. Roe*, 429 U.S. 589, 599–600 (1977); *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977). The first principle "protects an individual's 'informational right to privacy[.]'" *Flaskamp v. Dearborn Public Schools*, 385 F.3d 935, 945 (6th Cir. 2004).

Defendants' brief assumes that "an individual has a privacy interest in the disclosure of HIV-and-AIDS-related information." (Def.'s Br. at 21.) So the Court assumes, without deciding, that there is a constitutionally-protected privacy interest in a private individual's HIV status. *See Moore v. Prevo*, 379 F. App'x 425, 428 (6th Cir. 2010) ("We join our sister circuits in finding that, as a matter of law, inmates have a Fourteenth Amendment privacy interest in guarding against disclosure of sensitive medical information from other inmates subject to legitimate penological interests."). *But see Doe v. Wigginton*, 21 F.3d 733, 740 (6th Cir. 1994) (dismissing a prisoner's constitutional privacy claim against a guard who viewed the prisoner's HIV test results because "the Constitution does not encompass a general right to nondisclosure of private information").

Defendants argue that Jones cannot assert an informational privacy claim because Jones' community talk regarding her HIV status and her HIV activism had already placed her HIV status in the public domain. (Def.'s Br. at 21–23.) At the hearing, counsel for Jones explained that it is not disputed that Jones told her story to members of her community, but maintained that the small scope of her disclosure (and the fact that it was not disclosed in open court) means that the information was still private. (Pl.'s Resp. at 20.) So the Court must address whether a previous disclosure of a private fact by a plaintiff bars a subsequent informational privacy claim, and whether the scope of the disclosure has any bearing on the analysis.

The Sixth Circuit addressed the first question in *Doe v. Lockwood*. In that case, an HIV-positive man and his partner sued several Ohio officials and entities after Lockwood, the Deputy

14

Health Commissioner for Warren, Ohio, publicly revealed that the man was HIV-positive. 1996 U.S. App. LEXIS 19088, at *3–9. The Court concluded, "In order to sustain their claim that John Doe has a federal constitutional right to informational privacy, the Does must allege facts to show that the information regarding John Doe's HIV status was not already in the public realm. . . . We do not believe that an individual can claim constitutional protection in the privacy of information that he or she has intentionally revealed, without coercion by the state, to the public." *Id.* at *4. The Court cited *Doe v. City of New York*, where the Second Circuit commented, "Certainly, there is no question that an individual cannot expect to have a constitutionally protected privacy interest in matters of public record." 15 F.3d 264, 268 (2d Cir. 1994) (citing *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 493–96 (1975); *Scheetz v. Morning Call, Inc.*, 946 F.2d 202, 207 (3d Cir.1991), *cert. denied*, 502 U.S. 1095 (1992)). The Court concludes that a would-be plaintiff cannot assert a constitutional information-privacy claim as to information that was already in the public realm at the time of the alleged privacy breach.

As to the scope of the disclosure, it appears that disclosure to a not-insignificant subsection of the public – such as a local community – is sufficient to invoke the *Lockwood* rule. Plaintiff is correct that both *Lockwood* and *National Polymer Products, Inc. v. Borg-Warner Corp.*, 641 F.2d 418 (6th Cir. 1981), another case cited in *Lockwood*, dealt with public disclosure on the record during judicial proceedings. *See Lockwood*, 89 F.3d 833 at *7 ("Doe's HIV-related information entered the public domain at the hearing."); *National Polymer*, 641 F.2d at 421 (discussing the "well-established principle of American jurisprudence that the release of information in open trial is a publication of that information and, if no effort is made to limit its disclosure, operates as a waiver of any rights a party had to restrict its further use."). And further,

15

the cases cited in *Doe v. City of New York* dealt with disclosure of the contents of court records, *Cox Broadcasting*, 420 U.S. at 493, and police records, *Scheetz*, 946 F.2d at 207. But disclosure in open court is not the only way a would-be plaintiff might "waive" confidentiality of the information at issue.

Courts outside this circuit have had occasion to examine privacy rights in information that the plaintiff previously revealed outside of a courtroom. For example, in *Doe v. Marsh*, 105 F.3d 106, 108 (2d Cir. 1997), two HIV-positive individuals sued several New York state entities after defendant Marsh, a social worker and educator, identified Plaintiffs as HIV-positive in the Acknowledgements section of a publicly-distributed educational manual. Plaintiffs filed suit under 42 U.S.C. § 1983, alleging that Marsh had violated their privacy rights under the First Amendment. *Id.* at 109. The Second Circuit assumed, without deciding, that there existed a "clearly established constitutional, confidentiality-based right to privacy which precluded the state from disclosing that the plaintiffs were persons with HIV." *Id.* at 110. But the court affirmed the district court's grant of summary judgment based on qualified immunity. *Id.* at 111. Given Plaintiffs' "actions— particularly identifying themselves at seminars and conferences as HIV-positive persons, and Roe's disclosure of her HIV-positive status in an educational videotape that she acknowledged would be used in a variety of educational settings— constituted a 'knowing and voluntary' waiver of their right not to have their HIV status disclosed to educators involved in HIV prevention." *Id.* Thus, there was no constitutional violation and no liability. *Id.*

And other courts have addressed disclosures similar in scope to Jones' community publicity and subsequent meeting. For example, in *Giaccio v. City of New York*, 502 F. Supp. 2d 380, 388 (S.D.N.Y. 2007), *aff'd*, 308 F. App'x 470 (2d Cir. 2009), a city employee asserted a

§ 1983 informational privacy violation claim based on a "leak" of his positive drug test, which ended up in a newspaper article on nepotism in the Department of Transportation. *Id.* at 383. The court dismissed the privacy claim:

> To the extent that Giaccio is claiming a violation of a right to privacy, such a claim also fails and must be dismissed. Giaccio testified that "everybody knew" at DOT that he had tested positive for marijuana. The record, including his own testimony, established that Giaccio disseminated his positive drug test results to his co-workers. His disclosure of the information also eliminates any expectation to a right of privacy and is a waiver of any right to privacy.

*Id.* at 388 (citations omitted).

Likewise, in *Gooden v. Carson*, No. CIVA2:05CV46-WCO, 2006 WL 1209923, at *3 (N.D. Ga. Apr. 26, 2006), a former Georgia water and sewer inspector sued his former supervisors for releasing his drug-test results to the public in response to an Open Records Act request from a reporter. The plaintiff had already disclosed the results to "several people, including co-workers, friends, and family members" and "admit[ted] that he did not instruct all of these people to keep the information confidential." *Id.* at *1. The court dismissed the § 1983 informational privacy claims on two bases: first, "plaintiff did not have a legitimate expectation of privacy in his drug test results because they were not medical records and because they implied criminal activity." *Id.* at *7. Second, "[t]he court further finds that plaintiff's own disclosure of the fact that his drug test was positive shows that he cannot establish that he had a legitimate expectation of privacy in this information." *Id.*

In this case, Jones disclosed her HIV status publicly over ten years prior to the incident at issue in this case. She testified that she put up flyers with her name and picture around her neighborhood in public places such as gas stations, and that she told her story at a bar that was open to the public with over 200 people in attendance. The Court finds that this public talk is enough to show that Jones' HIV status was already information in the public realm by the time

the Department released the dashcam footage (to another individual with Plaintiff's express consent). Accordingly, there was no informational privacy violation. The motion for summary judgment is granted as to Count I.

**B. Count II – § 1983 Claim Against the City of Dearborn**

In Count II, Jones asserts that the Dearborn Police Department has a practice or custom of failing to "prevent constitutional and ADA violations on the part of its police officers." (Compl. at ¶ 38.) The Supreme Court addressed municipal liability under § 1983 in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). There, the Court held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

Under *Monell*, a claim may be made against a city for inadequate police training, as Jones asserts here. (Pl.'s Resp. at 21.) In *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985), the Supreme Court held that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy" that is attributable to "a municipal policymaker." Shortly thereafter, in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989), the Court clarified the standard: "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."

18

The Sixth Circuit has held that "[t]o succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006); *see also Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 794 (6th Cir. 2012) ("The City can be held liable under plaintiffs' failure-to-train theory if plaintiffs' injuries can be attributed to the City's failure to adequately train Spike and this failure amounted to 'deliberate indifference' to the rights of members of the public."). Defendants say that Jones cannot establish the deliberate indifference element. (Def.'s Br. at 19.) The Court agrees.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Regets v. City of Plymouth*, 568 F. App'x 380, 394 (6th Cir. 2014) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). There are two ways to demonstrate deliberate indifference. Jones could "show prior instances of unconstitutional conduct demonstrating that the [Dearborn Police Department] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). In the alternative, Jones could show "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation . . . ." *Id.* (quoting *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)). The Court finds no genuine issue of material fact on either alternative.

19

First, Jones has not shown that there were any prior instances of unconstitutional conduct by Dearborn police officers, or that the Department was aware of any such incidents—let alone incidents similar to the one between Jones and Lacey. Jones relies on Lacey's comments that "when we get pissed, bad things happen[.]" (Pl.'s Resp. Br. at 21.) But there is no other evidence in the record that Lacey or any other officer engaged in prior similar discriminatory conduct. In fact, Chief of Police Ronald Haddad testified that he was not aware of any complaints regarding disability discrimination made against the Dearborn Police Department since he started there in 2008. (Haddad Dep. at 35–36.) Further, Lacey's written reprimand indicates that he had never been reprimanded before the traffic stop at issue in this case. (Notice of Written Reprimand at 2.) And the reprimand itself demonstrates that the Department was not apt to ignore such incidents. No reasonable jury could find that Jones established that the City of Dearborn was deliberately indifferent through the first method outlined in *Plinton. Cf. C.K. v. Bell Cnty. Bd. of Educ.*, 865 F. Supp. 2d 795, 799 (E.D. Ky. 2012) (denying summary judgment as premature in a *Monell* claim against the school for sexual abuse where discovery had not yet closed and the plaintiffs had already uncovered five incidents of inappropriate sexual behavior between teachers and students and that the superintendent of the school system was aware of inappropriate images on a teacher's cell phone).

Second, the alternative avenue to establish deliberate indifference is narrow. The Supreme Court has explained that

> In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate

indifference" to the obvious consequence of the policymakers' choice – namely, a violation of a specific constitutional or statutory right.

*Brown*, 520 U.S. at 409 (citing *Canton*, 489 U.S. at 390 n.10). And the Sixth Circuit has commented that "[f]or liability to attach in the instance of a single violation, the record must show 'a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.'" *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 567 (6th Cir. 2011) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982)). Further, *Canton*'s hypothetical was "premised on the assumption that the municipality had decided *not* to train its officers" at all regarding the violation at issue. *Id.* For example, in a case where the officer "had received *some* training," in the use of deadly force, the plaintiff would need "to show that the County, through its policymaker(s), was on notice that, absent additional training, it was so highly predictable that sheriff's deputies would misuse deadly force as to amount to conscious disregard for citizens' rights." *Id.*

As will be discussed below, Jones has established that there is at least a triable issue of fact as to whether a "single violation of federal rights" under the ADA occurred. But Jones has not shown that the City has "failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." While it is undisputed that there was no training specific to individuals with HIV/AIDS, Defendants have pointed to evidence that the City trained its police officers in how to interact with people with disabilities, safety precautions for bloodborne pathogens, and general sensitivity. And the City has not received a complaint similar to Jones' within the past seven years. A reasonable jury could not find, on this evidence, that it was so highly predictable that the City's officers would discriminate against individuals with HIV/AIDS that the lack of additional training amounted to a conscious disregard for

citizens' rights. Merely pointing to the shortcomings in Lacey's interaction with Jones on the date in question will not serve to carry Jones' burden on summary judgment on the issue of deliberate indifference. *See Harvey*, 453 F. App'x at 568 ("To reiterate, it is not reasonable to draw inferences—as the district court appears to have done—of inadequate training, deliberate indifference and causal effect from the mere fact that, given the training he had, Lowe still shot and killed Harvey.").

The motion for summary judgment is granted as to Count II.

## C. Count III – ADA Title II Violation Against Lacey

In Count III, Jones asserts that Lacey violated her rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132. Specifically, the Complaint cites 42 U.S.C. § 12203(a) and (b), Title II's anti-retaliation and anti-coercion provisions. And Jones' response brief cites *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232 (M.D. Pa. 2003), a case decided under 42 U.S.C. § 12132, Title II's anti-discrimination provision. Defendants have presented argument regarding all three sections.[1]

---

[1] Defendants do not appear to dispute that the ADA applies to Lacey's conduct during this incident. While the Court is not inclined to address an issue that neither party briefed, the Court notes that in this circuit, "[c]ase law addressing whether or how Title II of the ADA is applicable to police conduct related to effectuating an arrest or an investigation is limited." *Scozzari v. City of Claire*, 723 F.Supp.2d 945, 970 (E.D. Mich. 2010); *see also Everson v. Leis*, 412 F. App'x 771, 774 (6th Cir. 2011) ("[W]hether Title II applies to arrests is an open question in this Circuit . . . ."). However, the Sixth Circuit has decided ADA cases with similar fact patterns as the present case without questioning the statute's applicability in those situations. *See, e.g.*, *Wolfanger v. Laurel Cty., Ky.*, 308 F. App'x 866 (6th Cir. 2009); *Tucker v. Tenn.*, 539 F.3d 526, 532 (6th Cir. 2008); *Dillery v. City of Sandusky*, 398 F.3d 562 (6th Cir. 2005); *Thompson v. Williamson Cty.*, 219 F.3d 555, 556 (6th Cir. 2000). Other circuits have declined to exclude police conduct during arrest from Title II's reach, *see, e.g.*, *Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II . . . is not the law.") or have recognized that there is a potential claim under Title II, *see, e.g.*, *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 174 (4th Cir. 2009) ("In the context of arrests, courts have recognized two types of Title II claims . . . ."). *See also City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1773 (2015) (dismissing writ of certiorari on

### 1. Retaliation and Coercion, 42 U.S.C § 12203

Title II's anti-retaliation provision states, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Title II's anti-coercion provision states, "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. § 12203(b).

Defendants assert that "the mere classification of Plaintiff as a member of a disabled class does not constitute a protected act under this section of the ADA." (Def.'s Br. at 13.) Given that Plaintiff does not assert that she made a charge or participated in a proceeding or otherwise exercised her rights under Title II of the ADA, Defendants say that her retaliation and coercion claims must be dismissed. Plaintiff's response brief does not address this argument, instead focusing on the ADA's anti-discrimination provision. (Pl.'s Resp. Br. at 16.) Having examined the record, briefing, and applicable law, *see Guarino*, 980 F.2d at 410, the Court agrees with Defendants.

Both provisions Jones cites require the plaintiff to assert that she engaged in protected activities under the ADA. "Protected activity typically refers to action taken to protest or oppose a statutorily prohibited discrimination." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *Goonan v. Fed. Reserve Bank of New York*, 916 F. Supp. 2d 470, 484–85 (S.D.N.Y. 2013)). Jones has not cited evidence to show that she "opposed any act or practice made

the question of whether Title II applies to "on-the-street responses to reported disturbances" as "improvidently granted" given the lack of adversarial briefing on the issue).

23

unlawful by this chapter" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter," or "exercised or enjoyed, or . . . aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." The mere fact that Jones fell within a protected class under the ADA does not constitute a protected activity under the ADA. *Compare* 42 U.S.C.A. § 12102(1) (defining "Disability") *with* 42 U.S.C. § 12203 (outlining protected acts).

The motion for summary judgment is granted as to the claims for retaliation or coercion under the ADA, to the extent Jones asserts them.

### 2.  Discrimination, 42 U.S.C. § 12132

Jones asserts that Lacey discriminated against her based on her HIV status. The Defendants do not dispute that Jones falls within the ADA's anti-discrimination protections due to her HIV status. But they argue that Jones cannot make out a prima facie case of discrimination under the ADA, and that Lacey's actions are protected by qualified immunity. The relevant ADA anti-discrimination provision states that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1084 (11th Cir. 2007) (commenting that "[w]e need not enter the circuits' debate about whether police conduct during an arrest is a program, service, or activity covered by the ADA. This is because [plaintiff], in any event, could still attempt to show an ADA claim under the final clause in the Title II statute: that he was 'subjected to discrimination' by a public entity, the police, by reason of his disability.").

The parties agreed that *Sandison v. Michigan High School Athletic Ass'n, Inc.*, 64 F.3d 1026 (6th Cir. 1995) governs Jones' discrimination claim and much of the briefing was based on *Sandison*. (Def.'s Br. at 10–11; Pl.'s Resp. at 15.)  Under *Sandison* and its progeny, "To make out a prima facie case under Title II of the ADA, [Jones] must establish that "(1) she has a disability; (2) she is otherwise qualified; and (3) she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of her disability." *Dillery v. City of Sandusky*, 398 F.3d 562, 567 (6th Cir. 2005) (citing *Jones v. City of Monroe*, 341 F.3d 474, 477 (6th Cir. 2003)).

But in *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012), the Sixth Circuit explicitly overruled the use of the "sole-cause" standard in ADA claims: "The sole-cause standard in the end is a creature of the Rehabilitation Act, and that is where we should leave it. The standard does not apply to claims under the ADA." Instead, the causation standard under the ADA is a "but-for" standard. *Id.* at 321 ("The ADEA and the ADA bar discrimination "because of" an employee's age or disability, meaning that they prohibit discrimination that is a "'but-for' cause of the employer's adverse decision." The same standard applies to both laws.").

Defendants' argument is that Jones cannot establish that Lacey issued her a ticket "solely by reason" of her disability because "the illegal marijuana possession serves as a legitimate non-discriminatory reason." (Def.'s Br. at 12.) Given *Lewis*, the standard Defendants placed on Jones is too high. *Compare* CAUSE, Black's Law Dictionary (10th ed. 2014) (defining "but-for" cause as "The cause without which the event could not have occurred.") *with id.* (defining "sole cause" as "The only cause that, from a legal viewpoint, produces an event or injury."); *see also Lewis*, 681 F.3d at 323 (Clay, J., concurring in part and dissenting in part) ("While the but-for standard may lessen the burden on plaintiffs seeking to prove disability-based discrimination when

25

compared with the sole-cause standard, it barely does so."). But the Court finds that, on the summary-judgment record, Jones can meet both the sole-cause and the but-for cause standards.

The parties agree that *Sandison*, 64 F.3d 1026, a case decided under the sole-cause standard, is relevant to Jones' discrimination claim. (Def.'s Br. at 10–11; Pl.'s Resp. at 15.) There, two nineteen-year-old students with learning disabilities sued their schools and the Michigan High School Athletic Association ("MHSAA") over a regulation declaring nineteen-year-olds ineligible to participate in high school sports. *Sandison*, 64 F.3d at 1028. The plaintiffs alleged that they were held back due to their learning disabilities (and were therefore older than other students at the same grade level), and so the regulation amounted to unlawful disability discrimination. *Id.* at 1029. The district court granted a preliminary injunction to the plaintiffs, and MHSAA appealed. *Id.* The Sixth Circuit first stated that "a plaintiff proceeding under title II of the ADA must . . . prove that the exclusion from participation in the program was 'solely by reason of [disability].'" *Id.* at 1036. And the Court found that "[a]bsent their respective learning disability, the plaintiffs still would not meet the age restriction." *Id.* Therefore, plaintiffs were "unlikely to succeed in establishing" the third element of their ADA claim. *Id.*

Defendants say that "[l]ike in *Sandison*, where regardless of the students' learning disability, their age prevented their inclusion in an activity, in the present case, regardless of Plaintiff's HIV status, since her card was expired, she was not permitted to possess marijuana at the time Lacey pulled her vehicle over." (Def.'s Br. at 12.)

The analogy is not apt. In *Sandinson*, there were two reasons why the plaintiffs could not get the benefit they sought: one discriminatory and one not discriminatory. Because of the latter, discrimination was not the "sole" reason they could not play sports. Here, however, when the facts are taken in the light most favorable to Jones, her HIV was the sole reason she received a

26

ticket. When Lacey first stopped the vehicle, he implied that there was no trouble and that he would likely allow Jones and Scott to "go on their merry way" in just a few minutes. He continued to make similar comments as he searched the car. But when Jones revealed her HIV status, Lacey became agitated. He admonished Jones and Scott several times before issuing citations. And he admitted, "Honestly, *if it wasn't for that*, I don't think I would have wrote anybody for anything, but that kind of really aggravated me, you know what I mean. . . ." (Video Tr. at 23 (emphasis added).) And Lacey was eventually reprimanded for "expressing prejudice towards a female who was revealed to be HIV positive." (Notice of Written Reprimand at 2.) A reasonable juror could conclude that Lacey was not going to issue any citations until, as Jones put it in her response, "[h]er HIV changed his mind." (Pl.'s Resp. at 18.) Drawing all reasonable inferences in Jones' favor, she has met her summary-judgment burden to show that she received a citation solely because of her HIV status.

*Dillery v. City of Sandusky*, 398 F.3d 562 (6th Cir. 2005), while decided under the sole-cause standard, also provides a useful comparison to this case. Dillery suffered from a neurological disorder and used a motorized wheelchair to move. *Id.* at 565. Because Sandusky's sidewalks were uneven, Dillery often chose to travel on the city streets in her wheelchair. *Id.* Dillery was ticketed on three occasions following complaints by motorists who had to swerve to avoid hitting her. *Id.* She alleged that the officers had discriminated against her under the ADA by ticketing her for using her wheelchair in the street. The Court rejected this claim because "the record reflects that police did not stop Dillery because of her disability, but rather stopped her in response to citizen complaints about her being in the roadway." *Id.* at 568. The police did not ticket Dillery "solely because of her disability" but rather were motivated by "their duties in investigating citizen complaints and keeping the roadways safe for both Dilley and passing

27

vehicles . . . ." *Id.* Here, by contrast, there is evidence that Lacey made the decision to ticket Jones based solely on her HIV status: Lacey's own comments.

Lacey's own comments also directly establish that Jones' HIV status was a "but-for" cause of his decision to issue the citation. By his own admission, "if it weren't for that, I don't think I would have wrote anybody for anything . . . ." This statement is sufficient to raise a genuine issue of material fact as to but-for causation. Thus, on this record, the Court finds that there is a genuine issue of material fact as to whether Lacey issued Jones the marijuana citation but for (or even solely because of) her HIV status.

Lacey also argues that he is entitled to qualified immunity on the ADA claim. (Def.'s Br. at 13.) But it appears that Lacey bases his qualified immunity defense on the first prong of the test. Defendants "do not assert that Plaintiff does not have the clearly established right to be free from discrimination" (Def.'s Reply at 4), rather, they argue that "Lacey's insensitive comments aside, the law is clearly established that possession of marijuana without a medical marijuana card is illegal . . . . Consequently, Lacey used his discretion and properly chose to issue Plaintiff a citation for the marijuana." (Def.'s Br. at 16.) But Lacey's "insensitive comments" are the heart of the issue. As discussed above, his comments could indicate that he was only choosing to write up Jones because of her HIV-positive status.

The motion for summary judgment on Jones' ADA discrimination claim against Lacey is denied.

### D. Count IV – Violation of Michigan Compiled Laws § 333.5131

Disclosure of an individual's HIV/AIDS status is governed by statute in Michigan. Compiled Laws § 333.5131. Generally, HIV test results and related information must remain confidential unless a statutory exception is met. *See generally People v. Odom*, 740 N.W.2d 557,

28

565 (2007) (citing Mich. Comp. Laws § 333.5131). The statute provides both civil and criminal penalties. A "person" who violates the statute will be "liable in a civil action for actual damages or $1,000.00, whichever is greater, and costs and reasonable attorney fees." Mich. Comp. Laws § 333.5131(8). The penalties "also appl[y] to the employer of a person who violates this section, unless the employer had in effect at the time of the violation reasonable precautions designed to prevent the violation." *Id.* Plaintiff argues that the City of Dearborn violated the statute by releasing the unredacted dashcam video in response to Heywood's FOIA request. (Pl.'s Br. at 26.) She does not appear to argue that Lacey himself violated the statute. (*See id.*) Defendants, in their reply brief, argue that the statute does not apply to governmental entities. (Def.'s Reply at 5.) While this argument was not presented in Defendants' opening summary-judgment brief so Plaintiff could not respond in his brief, the issue was raised and addressed during the oral argument. Plaintiff argued that the definition of "person" does not specifically exclude governmental entities and therefore it implicitly includes them in its scope. The Court does not agree.

The subsection regarding penalties applies to "a person" and an "employer of a person . . . ." Mich. Comp. Laws § 333.5131(8). The Definitions section of Article 5, Part 5 of Act 368 of the 1978 Public Health Code, of which § 333.5131 is a part, provides that "article 1[] contains general definitions and principles of construction applicable to all articles in this code." Mich. Comp. Laws § 333.5101. In turn, Article 1's Definitions section provides that "'Person' means an individual, partnership, cooperative, association, private corporation, personal representative, receiver, trustee, assignee, or other legal entity. Person *does not include a governmental entity* unless specifically provided." Mich. Comp. Laws § 333.1106 (emphasis added); *see* Mich. Comp. Laws § 333.5101(2). And § 333.5131 does not so "specifically provide[.]"

29

Thus, the statute's definition of "person" directly contradicts Plaintiff's argument. Additionally, "[a]s a rule, a definition which declares what a term means excludes any meaning that is not stated." *Burgess v. United States*, 553 U.S. 124, 130 (2008) (quotation marks and alterations omitted).

At oral argument Plaintiff's counsel also asserted that a Dearborn employee must have granted the FOIA request and so the City would be an "employer of a person" under § 333.5131(8). But there is nothing in the record showing that a City employee processed the FOIA request, nor is there anything in the record regarding any "reasonable precautions" the City might have had in place at the time of the request (so as to relieve it from liability as the employer pursuant to Mich. Comp. Laws Ann. § 333.5131(8).) And, again, the statute expressly excludes governmental entities.

The motion for summary judgment is granted as to Jones' statutory privacy claim.

## IV. CONCLUSION

Viewing the facts in the light most favorable to Jones, Officer Lacey's statements in the video transcript could give rise to a finding of ADA discrimination. But Jones' other § 1983 claims fail because the record and undisputed facts establish that Jones' HIV status was knowledge in the public realm, and that the City of Dearborn was not deliberately indifferent to the rights of citizens with HIV/AIDS. And Jones' claim under Michigan's HIV/AIDS privacy law fails as a matter of statutory interpretation.

Accordingly, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment (Dkt. 26.) The surviving claim is Count III, ADA discrimination against Lacey.

<u>s/Laurie J. Michelson</u>
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  June 5, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 5, 2015.

<u>s/Jane Johnson</u>
Case Manager to
Honorable Laurie J. Michelson